## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**WILFRIDO RIVERA TORRES**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 22-1112 (BJM)

### OPINION & ORDER

Wilfrido Rivera Torres ("Rivera Torres") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Dockets No. ("Dkts.") 24, 30. Rivera Torres contends the administrative law judge ("ALJ") wrongly evaluated the totality of the evidence regarding both the physical and mental limitations when determining the residual functional capacity ("RFC"). *Id*. The Commissioner opposed. Dkt. 28. This case is before me by consent of the parties. Dkts. 18-19. For the reasons set forth below, the Commissioner's decision is **AFFIRMED.**

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner." 42 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health and Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

# BACKGROUND

## A. Medical History

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript. Because the Commissioner previously found Rivera Torres was not disabled prior to December 7, 2017, and his date last insured was December 31, 2017, I will focus mainly on his medical history from six months prior to six months after his insured period, Tr. 29, except where noted.

*Treating Sources: Physical Limitations*

### Cooperación del Fondo del Seguro del Estado ("CFSE")– Servicios Médicos

Dr. Sol G. León Rodríguez usually examined Rivera Torres during the latter's visits to the CFSE. This included post-surgery check-ups in 2016, during which Rivera Torres complained of mild and moderate lower-back pain. Tr. 1761-63. He mentioned feeling better after his second surgical intervention, which took place earlier that same year. *Id*. However, the record also reflects that Rivera Torres continuously complained of lower-back pain. During two follow-up visits on June 28, and July 20, 2017, Rivera Torres complained of lower-back pain, pending evaluation by the spine orthopedist. Tr. 850-51. By August 7, Rivera Torres still complained of lower-back pain and had not yet been evaluated by the spine orthopedist. Tr. 1739. On October 4, Rivera Torres mentioned mild lower-back pain accompanied by cramps and a burning sensation. Tr. 1731. During a follow-up visit on November 29, Dr. Roberto Reyes Rodríguez, also of the CFSE, examined Rivera Torres, who reported worsened pain. Tr. 1730.

Dr. León examined Rivera Torres on January 17 and February 28, 2018, and Rivera Torres presented moderate pain at those times. Tr. 1727-29. Dr. León also indicated Rivera Torres was evaluated that February by the spine orthopedist, who recommended physical therapy. *Id*. During

a follow-up visit to Dr. León on April 18, Rivera Torres reported mild back pain and was asked to continue physical therapy. Tr. 1725. At a May 24 follow-up visit to Dr. León, he stated he did not improve with therapies and could not continue therapy because of the pain, which he described as moderate. Tr. 1723. During another follow up appointment on July 26, Dr. León noted the orthopedist's evaluation which recommended new medical studies as well as continuing psychiatric treatment. Tr. 1720. As a result of those studies, the orthopedist indicated Rivera Torres did not need cervical surgery and thus discharged him because he had "received the maximum benefit from treatment for his condition." Tr. 1703.

### Dr. José Montañez Huertas, MD

Dr. Montañez, an orthopedic doctor, had previously performed spinal surgeries on Rivera Torres and periodically reevaluated him. Tr. 226, 345, 371. He first performed a L5-S1 surgery on Rivera Torres on June 22, 2015. Tr. 1765. Dr. Montañez performed the most recent surgery on April 16, 2016. Tr. 1766-67. Rivera Torres's recovery post-surgery was reported as satisfactory over a month later, on May 23. Tr. 1767. In November 2016, Dr. León noted Dr. Montañez had evaluated Rivera Torres and recommended not lifting heavy objects nor driving for more than one hour, pending reevaluation in three months. Tr. 1552.

Dr. Montañez examined Rivera Torres in April 2017, and recommended "no heavy labor." Tr. 863. Yet he did not reexamine Rivera Torres until February of the following year due to Hurricanes María and Irma. Tr. 390. Dr. Montañez evaluated Rivera Torres on February 8, 2018, and Rivera Torres reported his knees were failing him and complained of testicular pain. *Id.* Dr. Montañez recommended physical therapy. *Id*. Dr. Montañez once again evaluated Rivera Torres on July 12, recommending new medical studies and examinations. Tr. 384. As stated previously, Dr. Montañez determined there was "no need for cervical surgery" on October 18, 2018. Tr. 1704.

**MEDSCI Diagnostic, Inc.**

A radiology report, dated February 8, 2018, found "no change" when comparing its results with films dated April 6, 2017, considering Rivera Torres's lumbosacral spinal fusion surgery. Tr. 1719.

**Dr. Rafael L. Olms Rivera, MD**

Dr. Olms performed a physical exam of Rivera Torres on September 5, 2018, and determined there was no evidence of neuropathy, radiculopathy, myopathy, radiculitis, or Carpal Tunnel Syndrome in the upper extremities. Tr. 1710-11. The median and ulnar nerves were also normal. *Id.* Moreover, there was no evidence of denervation, neuropathy, radiculitis, or any myopathic changes in the lower extremities. *Id.*

**Dr. Elba Velázquez, MD**

Dr. Velázquez, a general practitioner, evaluated Rivera Torres on April 3, 2020, long after the date last insured. Tr. 2032. She concluded Rivera Torres was unable to perform any kind of work because he had a diminished motor system and diminished reflexes, along with difficulties sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. *Id.*

***Treating Sources: Mental Limitations***

**Dr. Luis J. Rivera, MD**

Dr. Luis J. Rivera, psychiatrist, treated Rivera Torres at the CFSE after his accident. During a follow-up appointment on December 10, 2015, Dr. Rivera noted Rivera Torres was tense, cooperative, logical, and depressed. Tr. 445. On January 19, 2016, Dr. Rivera described Rivera Torres as cooperative, calm, logical, and coherent. Tr. 441. On March 31, Dr. Rivera reported moderate improvement, and again described Rivera Torres as calm, cooperative, logical, and

coherent. Tr. 231. Dr. Rivera then discharged Rivera Torres and recommended he continue with private treatment. Tr. 230.

### Centro de Acción Vida Integral

Rivera Torres received treatment at Centro de Acción de Vida Integral ("CAVI") beginning on April 30, 2016. Tr. 1830. He was primarily evaluated by Dr. Roberto Toro Arroyo, Psy. D. *Id.* During a July 30 appointment, Dr. Toro observed Rivera Torres to be calm, groomed, logical, cooperative, coherent, and in a good mood. Tr. 588. On September 3, Dr. Toro reported similar findings, and finalized his progress notes by stating Rivera Torres left the appointment in a calm mood. Tr. 589. On October 1, Rivera Torres presented as calm, communicative, logical, and coherent, but reported feeling anxious. Tr. 591. On November 12, Rivera Torres reported visual hallucinations, but also left the appointment in a calm mood. Tr. 590.  By December 10, Dr. Toro observed Rivera Torres to be worried, anxious, logical, and coherent. Tr. 592. Because Rivera Torres mentioned suicidal thoughts, Dr. Toro referred him to Pavía Hospital for a clinical evaluation. *Id.*

After the hospitalization, Dr. Toro evaluated Rivera Torres on January 21, 2017, during which he described Rivera Torres's demeanor as calm, cooperative, logical, and coherent. Tr. 580. Rivera Torres denied suicidal or homicidal thoughts but reported hallucinations. *Id.* Dr. Toro reported similar findings on March 4. Tr. 581. On April 8, Dr. Yasmin Jiménez, Psy. D. evaluated Rivera Torres. Tr. 582. She reported Rivera Torres presented as calm, cooperative, logical, and coherent, although he again referenced occasional visual and auditory hallucinations. *Id.*

During a follow-up visit on June 10, 2017, Rivera Torres presented as calm, logical, coherent, with a relevant thought process, and without any perceptual disorders. Tr. 1945. Dr. Jiménez made similar findings July 8, August 5, and September 2, 2017. Tr. 1946-48. She also

mentioned Rivera Torres had trouble walking. *Id*. Dr. Jiménez further evaluated Rivera Torres on October 21 and November 25, 2017, and Rivera Torres left both appointments in stable condition. Tr. 1937-38.

Importantly, Dr. Toro evaluated Rivera Torres on December 28, 2017, after his release from Pavía Hospital. Tr. 1939-40. He observed Rivera Torres to be calm, measured, coherent, logical, and with a relevant thought process. *Id*. Moreover, during a January 20, 2018 appointment, Dr. Toro found Rivera Torres remained "partially stable" with medications, though he was not adhering to his pharmacological treatment due to a variety of stressors. Tr. 1935-36. As stipulated in a certification dated December 3, 2019, Dr. Toro diagnosed Rivera Torres with major depressive disorder (F32.2) and mood disorder due to known psychological condition with depressive features (F06.31). *Id*. At that time, he also recommended continuing with psychological treatment, once a month for 45 minutes, along with medication. *Id*.

Dr. Annette Martínez, a psychiatrist, began treating Rivera Torres on February 14, 2018. Tr. 1834-35. In a letter dated after Rivera Torres's last appointment on July 10, 2019, Dr. Martínez stated Rivera Torres was being treated with the following medications: Klonopin 2mg, Risperdal 3mg, Effexor 75mg, and Restoril 15mg. *Id*. She concluded noting Rivera Torres had a poor prognosis and, as such, could not work nor generate income. *Id*.

Prior to this, Dr. Martínez's evaluations of Rivera Torres were consistent. On April 11, 2018, she observed that Rivera Torres seemed anxious, coherent, cooperative, and reported experiencing hallucinations. Tr. 1915-17. On May 16, she again reported that, although Rivera Torres was cooperative with an appropriate affect, he had diminished concentration and judgment capabilities. Tr. 1912-14. Lastly, Dr. Martínez observed that Rivera Torres's mental state had not improved and that he had trouble performing day to day activities. Tr. 1897-99.

### Pavía Hospital – Yauco

Rivera Torres was first treated at Pavía Hospital from December 10 to December 16, 2016. Tr. 579, 2608. Upon admission, the attending doctor mentioned Rivera Torres attempted to commit suicide. Tr. 579. Rivera Torres reported symptoms of sadness, discouragement, anger, anxiety, and loss of sleep. *Id*. Rivera Torres was again treated at Pavia Hospital the next year, from December 20 to December 25, 2017. Tr. 2025-27. At admission, he was diagnosed with recurrent major depressive disorder with psychotic symptoms (F33.3). *Id*. Upon discharge, he reported a significant improvement of symptoms. *Id.* Doctors recommended he continue ambulatory pharmacological and psychotherapeutic treatment, under supervision. *Id*.

### Dr. Luis Umpierre, Psy. D.

After reviewing the record in September 2019, Dr. Umpierre stated Rivera Torres was not disabled because there was insufficient evidence to assess his mental limitations from December 2 to December 31, 2017. T. 1234-41.

### Dr. Bárbara Hernández, Psy. D.

Like Dr. Umpierre, Dr. Hernández determined Rivera Torres was not disabled, because there was insufficient evidence to evaluate his claim. Tr. 1243-53. This decision was made on January 3, 2020, more than two years after the relevant time frame. *Id*.

## B.  Procedural History

Rivera Torres applied for disability benefits on July 2, 2019, alleging an onset date of October 1, 2013. Tr. 76. His claim was denied initially, Tr. 96-99, and upon reconsideration. Tr. 100-02. He requested a hearing which was held over teleconference due to the restrictions imposed by the COVID-19 pandemic. Tr. 72-88. During the hearing, the ALJ clarified Rivera Torres had previously filed another application, which was first denied on April 8, 2015. Tr. 89-91.

At the hearing, Rivera Torres testified he had not been able to work since his accident in 2013. Tr. 78. He averred he still felt the effects of his accident and subsequent surgeries, as he could not bend nor lift any weight. *Id*. Moreover, he said he was experiencing heart problems, including a past heart attack and arrythmia. Tr. 79. As to his mental state, Rivera Torres testified he was experiencing panic attacks and anxiety issues. Tr. 80 The ALJ then asked how his social and personal life were impacted by his conditions. Rivera Torres responded he did not have a social life as his physical impediments prevented him from walking much. Tr. 81. Moreover, he depended on his family members to dress him. *Id*. Lastly, the ALJ questioned whether Rivera Torres could drive his car. Rivera Torres stated he had driven a couple of times in 2017, the year of the date last insured, but mostly depended on others to drive him to his medical appointments. Tr. 82.

Next, vocational expert ("VE"), Pedro Román, testified. He stated Rivera Torres previously worked as an insulator (DOT 869.664-014). Tr. 83.  The ALJ asked the VE whether a person with Rivera Torres's limitations could work as an insulator and the VE replied he could not. Tr. 84. After noting Rivera Torres had a sixth-grade education and was relatively young, the ALJ asked whether a hypothetical person with this background could perform any work that exists in the national economy. *Id*. The VE answered that Rivera Torres could work as an assembler for printer products (DOT 794.687-010), cashier II (DOT 211.462-010), and as a pricing tag marker (DOT 209.587-034), amongst other jobs. *Id*.

The ALJ then noted Rivera Torres needed to use a cane to walk, could carry out simple tasks, and could concentrate or persist for two hours. *Id*. Given these conditions, the VE testified Rivera Torres could perform sedentary work, such as charge account clerk (DOT 205.367-014), document preparer (DOT 249.587-018), and telephone quotation clerk (DOT 237.367-046). Tr.

86. Lastly, the ALJ asked the VE to consider that, along with his previous limitations, Rivera Torres could occasionally interact with others. *Id*. The VE said this would disqualify Rivera Torres from working as a charge account clerk (DOT 205.367-014), telephone quotation clerk (DOT 237.367-046), or cashier II (DOT 211.462-010). *Id*. However, he testified other sedentary jobs with all the above-mentioned limitations were available, such as toy stuffer (DOT 731.685-014) and nut sorter (DOT 521.687-086). *Id*. Under questioning by his attorney, Rivera Torres testified his prescribed medications made him very sleepy, causing him to sleep around three to four hours during the day. Tr. 82-83. Thus, his attorney asked the VE whether the hypothetical person could perform the recommended jobs considering this limitation and the VE answered he could not. Tr. 87.

The ALJ announced her decision on January 22, 2021. Tr. 28-41. She found no basis for reopening Rivera Torres's first disability insurance benefits application, filed on November 18, 2014, and denied by a different ALJ on December 6, 2017. Tr. 28 As such, the ALJ for the current claim only considered the period from the date after the prior ALJ's decision up to the date last insured, which would be from December 7 to December 31, 2017. Tr. 29. After this determination, the ALJ found Rivera Torres had not engaged in substantial gainful activity since the alleged onset date. Tr. 31. Further, she found he suffered from the severe impairments of lumbar degenerative disc disease and major depressive disorder. *Id.*

Proceeding to Step Three, the ALJ found Rivera Torres had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment. *Id.* In support of this determination, the ALJ noted she had considered Listing 1.04 for his physical impairment but concluded that Rivera Torres's conditions did not satisfy the required criteria as there was no evidence of "neurological, motor, sensory or reflex loss." Tr. 32. The ALJ also considered Rivera Torres's weight as a mitigating factor, as there is no listing specific to obesity. *Id*.

Assessing Rivera Torres's mental impairment under Listing 12.04, the ALJ found moderate limitations in the following three Paragraph B functional areas: understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. Tr. 33.

As to understanding, remembering, or applying information, Rivera Torres had trouble remembering, following instructions, paying bills, and he needed reminders to take his medications. *Id*. But, there was no reported significant cognitive deficit. *Id*.

As for interacting with others, the ALJ noted Rivera Torres reportedly lacked a social life and experienced irritability, anger, and anxiety. *Id*. However, Rivera Torres had no problem getting along with family members, friends, neighbors, and others. *Id*. Moreover, he was reported to be cooperative. *Id*.

Regarding concentrating, persisting, and maintaining pace, Rivera Torres reported needing reminders to take care of his personal needs. *Id*. He also mentioned difficulty remembering, concentrating, and completing tasks. *Id*. However, he reported reading the Bible and driving short distances. And doctors frequently described him as alert and oriented. *Id*.

As to the final functional area, adapting and managing oneself, the ALJ found Rivera Torres had a mild limitation. *Id*. Although he had trouble with his personal care and hygiene, this was mostly due to complications arising from his physical impairments. *Id*. He also reported driving short distances and was mostly described as cooperative in his psychological evaluations. *Id*. Given that none of the functional areas had marked nor extreme limitations, the Paragraph B criteria were not satisfied. *Id*.

As to Paragraph C, the ALJ determined Rivera Torres's mental condition was serious and persistent but did not require an ongoing highly structured setting to diminish the symptoms. *Id*. Thus, the Paragraph C criteria were not met. Tr. 34.

The ALJ then proceeded to Step 4. In determining Rivera Torres's RFC, the ALJ noted his back problems, such as the fact that he experienced pain, could not bend, could not walk long distances, and had a failing leg for which he used a cane to walk. Tr. 35. She also considered his alleged mental impairments and cardiac issues. *Id*. The ALJ concluded that the evidence supported finding Rivera Torres experienced symptoms and limitations, but not to the extent alleged. *Id*.

To reach this conclusion, the ALJ noted Rivera Torres's medical history beginning with his initial injury in 2013. *Id*. Radiological studies revealed a muscle spasm, narrowed disc space at the L5-S1 level, mild central- and lateral- canal stenosis at L3-L4 level, disc desiccation at the L5-S1 level, moderate central- and lateral-canal stenosis at the L4-L5 level, and posterior disc bulge at the L5-S1 level. *Id*. As such, Rivera Torres received a nerve block, and later underwent L5-S1 surgery on June 22, 2015. *Id*. He later underwent lumbar fusion on April 16, 2016. *Id*. A June 2016 examination showed diminished range of motion of the lumbosacral spine. Two months later, Rivera Torres reported waist pain and leg numbness. *Id*. A spine orthopedist reevaluated him in November 2016 and recommended he not lift heavy objects or drive more than an hour. *Id*. At a March 2017 physical examination, Rivera Torres presented diminished range of motion of the lumbosacral spine. Tr. 36. However, no gross neurological deficits or atrophy at the extremities were noted. *Id*. In April 2017, an orthopedist surgeon revaluated Rivera Torres and considered removal of the instrumentation. *Id.* However, there is no record of this procedure. *Id*. In November, Rivera Torres complained of worsened pain and was found with decreased range of motion of the lumbar spine accompanied by left leg problems. *Id*.

The ALJ mentioned Rivera Torres presented moderate lumbar pain and diminished range of motion of the lumbar spine after the date last insured. *Id*. She noted he was evaluated by the spine orthopedist, who then recommended physical therapy. *Id*. The ALJ then cited reports of improvement of the Rivera Torres's symptoms. *Id*.

The ALJ next discussed Dr. Elba Velázquez's April 2020 examination in which she concluded Rivera Torres could not work. *Id*.  The ALJ considered this opinion not persuasive as the physical evaluation took place long after the relevant period. *Id*. Moreover, she concluded Dr. Velázquez's opinion was not supported by the overall medical evidence and Rivera Torres's reported activities of daily living. *Id*.

The ALJ moved on to discuss Rivera Torres's treatment at the CFSE due to depressive symptoms. *Id*. She noted his mental impairment remained stable with the prescribed medications. *Id*. In January 2016, he was reportedly calm, alert, cooperative, fully oriented, logical, relevant, coherent, and without suicidal or homicidal ideations. *Id*. The ALJ found that Rivera Torres remained in a similar state in March 2016 and was diagnosed with major depressive disorder, single episode at that time. *Id*.

The ALJ next recounted Rivera Torres's treatment at CAVI for symptoms such as depressed mood, lack of interest, low appetite, sleep disturbances, frequent crying spells, lack of energy, and diminished concentration. Tr. 37. In April 2016, he was reportedly depressed and anxious but with normal impulse control; logical and coherent thought process; full orientation; intact memory skills; adequate concentration; and good judgment. *Id*. Similar findings were made in July, September, October, and November 2016, although he reported hallucinations during the September and November appointments. *Id*.

On December 10, 2016, the ALJ noted Rivera Torres was referred for evaluation at Hospital Yauco Metro Pavía after reporting structured suicidal ideas. *Id*. Rivera Torres remained hospitalized from December 10 to December 16, 2016. *Id*. During a January 2017 follow-up evaluation at CAVI, Rivera Torres reported little improvement of his depressive symptoms, but the ALJ noted Dr. Toro Arroyo found him calm, in a better mood, cooperative, logical, coherent, relevant, and fully oriented. *Id*. Similar findings were reported on March 4, June 10, and August 5, 2017. *Id*.

The ALJ next examined Rivera Torres's treatment at First Health System, ("FHS"). *Id*. He was treated there from 2016 to 2017 and the record reflected stable mental status evaluations. *Id*. He was diagnosed with recurrent severe major depressive disorder without psychotic features. *Id*.

The ALJ then examined another psychiatric hospitalization from December 20 to December 25, 2017 due to exacerbated depressive symptoms with psychosis. *Id*. Then, Rivera Torres was discharged and instructed to follow an ambulatory treatment. *Id*. On December 27, 2017, the ALJ noted Dr. Toro Arroyo found Rivera Torres presented a "flat affect, coherent, logical and relevant thought process, and full orientation." *Id*. On January 20, 2018, Rivera Torres presented with a depressed mood but had appropriate affect, no cognitive deficit, and an intact thought process. Tr. 38. The ALJ further noted Rivera Torres had only partially complied with medication instructions due to multiple stressors. *Id*.

The ALJ next cited Dr. Annette Martínez's findings. She began treating Rivera Torres in February 2018 and concluded he could not work or generate income at that time. *Id*. However, the ALJ found this opinion unpersuasive as Dr. Martínez did not treat Rivera Torres during the relevant period. *Id*.

Lastly, the ALJ considered the opinions of Drs. Luis Umpierre and Bárbara Hernández, who both found insufficient evidence to assess Rivera Torres's limitations. *Id*. She concluded their opinions were not persuasive as "it is shown that there is evidence of the presence of a severe depressive disorder that imposed moderate limitations in the claimant's mental functioning." *Id*.

Accordingly, the ALJ concluded that, although Rivera Torres's records supported the presence of a lumbar spine impairment and depressive state, the statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id*.  As such, the ALJ determined Rivera Torres had the RFC to perform sedentary work, except he could lift and carry up to 10 pounds, stand and/or walk for two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Tr. 34. He could further push or pull the same weight as he could lift or carry; occasionally climb ramps, stairs, ladders, and scaffolds; balance; stoop; kneel; crouch; and crawl. *Id*. He was unable to work in high exposed places and needed to use a cane to ambulate. *Id*. But, Rivera Torres could perform simple, routine, and repetitive tasks and understand, remember, and carry out simple instructions. *Id*. Still, he could not perform his past relevant work as an insulator because it required heavy exertion and semiskilled mental functions beyond his RFC. Tr. 39.

Thus, the ALJ proceeded to Step Five. There, she found, as of the date last insured, Rivera Torres was 42 years old and thus defined as a younger individual. *Id.* Further, he had a marginal education. *Id*. Given Rivera Torres's background and RFC, the ALJ adopted the VE's finding that Rivera Torres could perform sedentary work as a toy stuffer, nut sorter, and document preparer, and thus able to adjust to other work that existed in the national economy despite his limitations. Tr. 40.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Rivera Torres mainly challenges the ALJ's determination at Step Five. Dkt. 21. First, he argues there was substantial evidence he was unable to perform any gainful activity during the relevant period due to both his mental and physical limitations. Dkt. 24 at 1. Second, he asserts the ALJ failed to properly weigh the evidence when determining the RFC, particularly his mental limitations. *Id.* at 1, 11. Lastly, Rivera Torres contests the ALJ's adoption of the VE's findings on three grounds: (1) the ALJ did not consider that he had been ambulating with a cane since his accident and paid "little or no" attention to his subjective complaints; (2) the ALJ did not give sufficient probative value to the psychologists' and psychiatrists' evaluations; and, (3) the ALJ disregarded the side effects caused by Rivera Torres's medications. *Id.*, at 11-12. I address each argument in turn.

### *Step Five*

At Step Five, a claimant has met his burden to show he is unable to perform **past** work, and the burden shifts to the Commissioner to produce evidence of specific jobs in the national economy that the claimant can still perform. *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). The Commissioner may satisfy this burden by obtaining testimony from a VE. *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). The ALJ is also required to express the claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity.  *Arocho*, 670 F.2d at 375.  In other words, a VE's testimony must be predicated on a **supportable** RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1) (emphasis added).

Rivera Torres first asserts there was substantial evidence to prove that he was unable to perform gainful activity. He emphasizes the ALJ erred in not weighing the totality of the evidence; particularly, he argues the ALJ did not sufficiently consider his mental and emotional conditions when determining the RFC, thus questioning the RFC assessment. Dkt. 24 at 1, 11. However, I find the ALJ's assessment of the evidence to be satisfactory.

An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982).

In determining the RFC, the ALJ stated the claimant could perform sedentary work. Tr. 34. Sedentary work, as defined in 20 C.F.R. 404.1567(a):

> [I]nvolves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

To make this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," Tr. 34, including the evaluations of Dr. Toro, Dr. León, and Dr. Montañez, as well as Rivera Torres's subjective complaints. The ALJ further dedicated an entire section to discuss Rivera Torres's mental and emotional impairment. Tr. 36-38. This included a thorough

examination of his psychological and psychiatric medical history. As such, the ALJ extensively discussed Rivera Torres's surgeries, low-back pain, medical evaluations and reevaluations, as well as psychiatric assessments, medications, and hospitalizations. She found Rivera Torres's "medically determinable impairments could reasonably be expected to cause symptoms," thus validating the Rivera Torres's limitations. Tr. 38. Upon analysis of the prior ALJ's decision and the evidence presented, she also asserted there was proof of a severe depressive disorder and a lumbar impairment that was exacerbated by his obesity. *Id*. She noted that although the evidence proved that Rivera Torres was depressed, he was also found to be "fully oriented, logical, coherent, relevant, and with adequate attention, concentration and memory skills." Tr. 38. Additionally, Rivera Torres "did not have any cognitive deficit that would have prevented him from engaging in simple tasks on a regular basis." *Id*.

Upon analysis of all physical and mental symptoms, the ALJ determined Rivera Torres's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.*

The ALJ's findings and inferences are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), (quoting *Consolidated Edison Co.,* at 229). Rivera Torres asserted there was substantial evidence to prove he was presently unable to perform gainful activity due to his physical and emotional limitations, although he did not support his claims with convincing critiques of the ALJ's consideration of the evidence. The ALJ instead concluded Rivera Torres could perform gainful activity and corroborated her determination by discussing the substantial evidence that led to her decision. Even if there is conflicting evidence in the record that could lead

to a different solution, the resolution for evidentiary conflict is for the Commissioner to resolve; the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán*, 819 F.2d 1 at 3. Because the ALJ properly considered the entirety of the record, including Rivera Torres's mental and emotional impairments, I find she based her decision on substantial evidence.

Rivera Torres further contests the ALJ's final determination that he could perform lighter, sedentary jobs. He presents three arguments to refute this assessment. First, Rivera Torres argues the ALJ did not consider that he has been ambulating with a cane since the incident nor did she note his subjective complaints regarding pain. Dkt. 21 at 11. Upon reviewing the ALJ's decision, this argument lacks merit. In the RFC determination, the ALJ wrote "[t]he claimant was unable to work in high exposed places and needed to use a cane to ambulate." Tr. 34. She also noted his complaints of lower back and lumbar pain, leg numbness, as well as his medical reevaluations and physical therapy due to said complaints of pain and discomfort. Tr. 34-36. Although there are no reports during the relevant period, in the months preceding it, Rivera Torres complained of mild lower-back pain accompanied by cramps and a burning sensation. Tr. 36. At an appointment one week before the relevant period, on November 29, 2017, he reported worsened pain. *Id*. However, after the relevant period, the following was reported:

> Subsequently, and after the date last insured, on January 17 and February 28, 2018, the claimant presented moderate lumbar pain and diminished range of motion of the lumbar spine. It was indicated that the clamant was evaluated by the spine orthopedist who recommended physical therapy (Ex. B-4F at 150 and 152). The medical evidence shows improvement of the claimant's symptoms. During follow-up visit on April 18, 2018, he reported mild back pain (Ex. B-4F at 148).

Tr. 36. I note this evaluation of the Rivera Torres's pain is immaterial as it falls outside of the relevant time frame, and the ALJ excluded other information for the same reasoning. *Id*. However,

it demonstrates that the ALJ did indeed validate and consider Rivera Torres's subjective complaints.

Second, Rivera Torres contends that the ALJ should have given greater probative value to the psychologists' and psychiatrists' input and diagnoses. I must uphold the Commissioner's argument as to the role of the ALJ, as they are not tasked with deferring or giving specific evidentiary weight to medical opinions or administrative medical findings. 20 C.F.R. § 404.1520c(a). They must instead consider the evidence using other factors, the most important being supportability and consistency. 20 C.F.R. § 404.1520c(c). Accordingly, the ALJ sufficiently considered the psychiatric treatment and diagnoses and concluded that they were moderate in effect. Her analysis does not warrant remand.

In analyzing his mental limitations to determine his RFC, the ALJ mentioned that Rivera Torres was able to perform "simple, routine, and repetitive tasks" and to understand, remember, and carry out "simple instructions." Tr. 34. He was also able to adapt to routine changes in the work setting, concentrate and persist for two-hour segments, and occasionally interact with the public. *Id*. In her RFC discussion, the ALJ noted a lack of cognitive deficit that would impede him from engaging in simple tasks on a regular basis and acknowledged the presence of a severe depressive disorder that imposed moderate limitations on his mental functioning and limited him to "no more than simple tasks and instructions and routine changes with reduced public interactions." Tr. 38. To back up her findings, the ALJ discussed Rivera Torres's extensive medical records and the reports provided by Dr. Roberto Toro Arroyo at Centro de Acción Vida Integral, First Health System, and Pavía Hospital at Yauco, which included multiple reports of him presenting as calm, cooperative, logical, receptive, and coherent, as well as "stable mental status evaluations." Tr. 36-38. As discussed previously, the record reflects the ALJ's observations.

More specifically, Rivera Torres argues that the ALJ erred in giving no valuable weight to the findings of Dr. Annette Martínez, a psychologist who opined that he could not work or generate income. Dkt. 24 at 14. It is well settled that even the opinions of treating physicians are not entitled to greater weight merely because they are treating physicians. *Ramos-Rodriguez v. Comm'r of Soc. Sec.*, 91 F. Supp. 3d 232, 240 (D.P.R. 2015). Additionally, as the ALJ validly reasoned, Dr. Martínez's opinion is not persuasive because she did not treat Rivera Torres during the relevant period. Tr. 38. Instead, she began treating him in February 2018, two months after it ended. *Id*. The ALJ further clarified that the issue of determining if a person meets the statutory definition of disability is left to the Commissioner, and not treating physicians. 20 C.F.R. § 404.1503. It is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *See Ortiz*, 955 F.2d at 769.

Lastly, Rivera Torres argued the ALJ should have addressed the side effects caused by his medication. During the hearing held before the ALJ on December 21, 2020, Rivera Torres's attorney asked him to list these side effects. Tr. 82-83. He specified that the medications led to sleepiness, causing him to nap for hours during the day. *Id*. The ALJ did not refer to the medication-side-effect issue in her decision. However, throughout his medical history, Rivera Torres has referred to sleep disturbances, and the ALJ took these into consideration when analyzing his mental limitations. Tr. 37. As early as April 2016, Rivera Torres reported problems sleeping. Tr. 1214. In May 2016, he stated these problems were associated with pain. Tr. 1174. However, after the relevant period, Rivera Torres reported a "good" sleep pattern on March 2, 2019, and a "normal" sleep pattern on August 22, 2019. Tr. 482, 518.

The ALJ is ultimately responsible for piecing together an RFC assessment based on the record. The ALJ can implicitly address controversy if her factual findings show she did indeed

resolve it. *See Linares Pagán v. Social Security Administration*, 2020 WL 12188416, at *4 (D.P.R., 2020) (quoting *Rosario Mercado v. Saul,* 2020 WL 2735980, at *15 (D. Mass. May 26, 2020) and *Blackette v. Colvin,* 52 F. Supp. 3d 101, 119 (D. Mass. 2014)). Although the ALJ did not refer explicitly to the sleep disturbances as a medication side-effect, she considered Rivera Torres's sleep issues in her RFC determination. Tr. 37. The ALJ here thoroughly discussed the persuasiveness of the evidence she considered to reach the RFC finding and ultimate Step Five determination. See *Frost v. Barnhart*, 121 Fed. Appx. 399 (1st Cir. 2005) (It is evident that "[t]he ALJ presented a detailed analysis of the record. [She] was not obligated to discuss every bit of evidence."). As such, the ALJ resolved the controversy at hand by implicitly considering the evidence. Accordingly, her determination does not warrant remand.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision **AFFIRMED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of October 2023.


S/ *Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge